IRVING, J, for the Court.
¶ 1. The Lamar County Chancery Court granted Laurin Jones Kay a divorce from Gregor Thomas Kay (Greg) on the ground of uncondoned adultery. The chancellor divided the marital estate and ordered Greg to pay child support for their two children. Feeling aggrieved, Laurin appeals and asserts: (1) that the chancellor erred in deviating from the statutory child support guidelines, (2) that the chancellor erred in ordering her to pay twenty percent of Greg’s student loan debt, (3) that the chancellor erred in not ordering that the debt on a vehicle purchased during the marriage be paid with proceeds from the sale of the marital home, and (4) that the chancellor erred in declining to award her alimony.
¶ 2. We find, as we explain below, that the chancellor failed to factor in all of Greg’s income when ordering him to pay $650 per month in child support. We also conclude that the chancellor failed to determine Greg’s gross or adjusted gross income. Therefore, we reverse the chancellor’s order requiring Greg to make monthly child support payments of $650 and remand the case for further proceedings consistent with this opinion.
FACTS
¶ 3. Laurin and Greg were married on October 3, 1992, and separated on December 6, 2006. They have two children, Hardin Thomas Kay, born on August 6, 2001, and Keller Grant Kay, born on December 20, 2006. On April 20, 2007, Laurin filed a complaint for divorce on the ground of adultery or, alternatively, irreconcilable differences. She sought full legal and physical custody of the children and asked that Greg be awarded reasonable visitation. She also requested that Greg be ordered to pay child support and alimony.
¶ 4. Greg filed an answer and counterclaim wherein he alleged that he was entitled to a divorce on the ground of habitual cruel and inhuman treatment or, alternatively, irreconcilable differences. Greg sought joint legal and physical custody of the children or, alternatively, temporary care, custody, and control of the children with reasonable visitation awarded to Lau-rin. Further, he requested that Laurin be ordered to pay child support.
¶ 5. The Lamar County Chancery Court heard the case on October 11, 2007. Greg admitted that he had been unfaithful to Laurin with several different women and that he was living with his paramour at the time of the hearing.
¶ 6. As for his employment, Greg testified that he has been employed as an assistant professor at the University of Southern Mississippi for the previous five years. Greg stated that he works full-time during the nine-month school year and earns $45,000 per year. He also stated that, in addition to his regular employment, he has taught summer school every year since he has been employed with the university. Greg’s 8.05 financial disclosure form[1] reflects that he earns $3,750 per month in gross income, pursuant to his nine-month contract. Greg testified that he received $4,500 in overload pay and $5,000 in grant money in 2007.
*624 ¶ 7. On cross-examination, Greg explained why his 2006 income tax return showed that he earned a gross income of $47,653.05 and a net income of $35,299.78. Greg stated that his overload pay was factored into that figure.
¶ 8. Following the hearing, the chancellor granted Laurin a divorce on the ground of uncondoned adultery. The chancellor then awarded the parties joint legal custody of the children, with Laurin receiving primary physical custody and Greg receiving reasonable visitation. Further, the chancellor ordered Greg to pay $650 per month in child support, concluding that his net take home pay was approximately $3,200. The chancellor also ordered that the marital home be sold and that the first $2,500 of the proceeds be applied toward Laurin’s attorney’s fees and that the next $2,000 be used by Laurin for relocation expenses. Then, the chancellor ordered that the next portion of the proceeds be used to pay joint marital bills that the parties had accumulated. Laurin was also awarded exclusive use and benefit of the home until it was sold. Greg was ordered to assume responsibility for eighty percent of a debt to Sallie Mae that he had incurred in student loans, while Laurin was ordered to pay twenty percent of the debt or $100 per month as long as the debt is being paid in installment payments. The chancellor denied Laurin’s request for alimony.
¶ 9. Shortly thereafter, Laurin filed a motion to reconsider wherein she requested that the chancellor reconsider his final judgment because she argued inter alia: (1) that the chancellor failed to include her vehicle, a 2005 Chevrolet Equinox, in the final judgment even though the parties had stipulated that all of the marital debt, with the exception of the Sallie Mae loan was to be paid from the proceeds of the sale of the marital home; (2) that the chancellor should reconsider his denial of alimony, because a financial disparity exists between the parties; (3) that the chancellor deviated from the child support guidelines without providing a detailed, written explanation for doing so; and (4) that the chancellor should reconsider his ruling ordering Laurin to pay a portion of Greg’s student loan debt.
¶ 10. On December 19, 2007, the chancellor entered a judgment on Laurin’s motion. The chancellor first addressed Laurin’s argument as it related to the Chevrolet Equinox by stating that “[i]f the debt to Regions Bank for [Laurin’s] vehicle, the Chevy Equinox, is a joint marital debt it will be paid from the proceeds of the home sale; if in the name of [Laurin] alone, she shall underwrite payment thereof.” The chancellor went on to find that the evidence revealed that some of the proceeds from Greg’s student loan were used to support the family and denied further consideration of the matter. As for alimony, the chancellor denied Laurin’s request that he reconsider his decision declining to award her alimony. Finally, the chancellor denied deviating from the child support guidelines and stated that based on the evidence before him, the support that he ordered was based on Greg’s income. It is from this decision that Laurin now appeals.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Child Support

 ¶ 11. It is well settled that an appellate court’s “review in domestic relations matters is limited by our familiar substantial evidence/manifest error rule.” Parker v. Parker, 641 So.2d 1133, 1137 (Miss.1994) (citing Stevison v. Woods, 560 So.2d 176, 180 (Miss.1990)). “[An appellate court] will not disturb the findings of a chancellor unless the chancellor was mani *625 festly wrong, clearly erroneous or an erroneous legal standard was applied.” Watson v. Watson, 724 So.2d 350, 354 (¶ 16) (Miss.1998) (quoting Bell v. Parker, 563 So.2d 594, 596-97 (Miss.1990)).
¶ 12. Laurin first argues that the chancellor erred in deviating from the statutorily imposed child support guidelines without providing justification for doing so. The chancellor made the following finding as it relates to Greg’s income for child support purposes:
Defendant’s net take home pay is calculated to be approximately $3,200.00 including his nine[-]month employment pay and summer wages. (Exhibit 6 at trial). He shall pay child support of $650.00 each month to Plaintiff beginning November 1, 2007, to be paid through the office of the Chancery Clerk of Lamar County, Mississippi, and keep the children covered with dental insurance. Plaintiff shall continue to keep them covered with medical insurance; the parties shall equally pay any uninsured medical or dental expenses of the children.
¶ 13. As evidenced above, the chancellor ordered Greg to pay $650 per month in child support based on Greg’s 2006 W-2 without considering either Greg’s testimony regarding his 2007 income or Greg’s 2007 payroll check stubs that were admitted into evidence. Also, the chancellor did not determine Greg’s gross or adjusted gross income.
¶ 14. As previously noted, Greg earns a salary of $45,000 from his employment with the University of Southern Mississippi for the nine-month school year, which is paid over twelve months. Also, a review of Greg’s payroll check stub for July 2007 indicates that he was paid $3,057.16 each month for three months for teaching summer school. Nevertheless, the chancellor determined that Greg earned $2,653.05 in summer wages. He reached this figure by subtracting Greg’s gross income ($47,-653.05), as reflected on his 2006 W-2, from his salary of $45,000.
¶ 15. Greg’s payroll check stub also reflects that his year-to-date salary in regular pay as of July 31, 2007, was $38,944.34. Thus, as of July 31, 2007, Greg received $3,944.34 above his regular pay because based on a pay rate of $5,000 per month, he would have only received $35,000 up to that point.
¶ 16. After reviewing Greg’s testimony and the exhibits admitted at trial, we conclude that Greg’s gross income for 2007 may be as high as $63,171.48. We arrive at this figure because in 2007, Greg received the following: $9,171.48 for teaching summer school for three months, $9,000 in overload pay for the fall and spring semesters, and a $45,000 salary. Greg also stated that he received a $5,000 grant.[2] When these figures, excluding the grant money, are factored into Greg’s gross income, his adjusted gross income is increased significantly to $63,171.48.[3]
¶ 17. The chancellor based his order of child support on Greg’s adjusted gross income as determined from his 2006 W-2. However, because we conclude that Greg’s gross income for 2007 may be significantly higher than that contemplated by the chancellor, we reverse the chancellor’s decision ordering Greg to pay $650 per month in child support and remand this case to the chancery court for a proper *626 determination of Greg’s adjusted gross income. Then, the chancellor should order child support based on that figure.
¶ 18. The dissent, contending that there is substantial evidence that Greg’s income for 2007 is an anomaly, believes we err in reversing the chancellor on this issue. We find the dissent’s position perplexing, as the dissent does not take issue with the figures used by the chancellor to compute the amount of child support that Greg should pay. As stated, the chancellor utilized Greg’s W-2 for 2006. It is undisputed that the 2006 W-2 includes wages earned for teaching summer school, yet the dissent suggests that this category of income should not be included in computing Greg’s adjusted gross income for child support purposes because it is uncertain “how much income Greg will receive from teaching summer classes” in the future. It is also undisputed that exhibit 7, which was introduced into evidence by Laurin, indicates that Greg would receive three payments of $3,057.16 for teaching summer school in 2007. This data alone indicates that Greg would earn $54,000 for the year 2007, without including any amount for overload pay. If the chancellor utilized Greg’s summer school earnings for 2006, we see no logical reason why they should not be used for 2007. After all, Greg testified that he had taught summer school every year since he had been teaching at the university, that being five years.
¶ 19. The dissent also takes issue with our finding that the chancellor should consider Greg’s overload earnings for 2007. The dissent supports its position with Greg’s testimony that 2007 was the first time that he received overload pay and that he received the pay only because he had to perform double duty because of a shortage of teachers. The dissent further cites Greg’s testimony that “his department was planning to hire a new faculty member, and when this new member was hired, there would not be any need to work overload, and thus, the overload payments would cease.” However, the dissent overlooks further relevant testimony that Greg gave regarding the subject of overload pay. We quote the following from the direct examination of Greg by Laurin’s counsel:
Q. Can you tell me what an overload indicates or what that means with respect to your income?
A. Sure. It’s when faculty are asked to work above and beyond their normal load. A normal load is 100 percent time basically, and overload is 125 percent time.
Q. Is that something you get every year?
A. No. This is the first year that I’ve gotten that. We just lost a faculty member. We had four, and now we have three trying to cover the work load of four.
Q. Does that mean you’re going to get a raise soon? You’re going to be taking a new position or move up?
A. I won’t be getting a raise unless the State decides that. I did get a position within the — there’s three recreation faculty. I’m now the recreation coordinator, and you get an additional release for that, is what they call it. That’s basically the amount of the overload.
Based on Greg’s testimony quoted above, it is clear that, in his new position as coordinator, he will receive the monetary equivalent of the amount that he received for overload pay. There is no indication that his new position as coordinator is temporary. Therefore, we see no reason why the amount of this additional salary should not be considered in figuring the proper amount of child support that Greg should pay.

*627
2. Division of Marital Estate

(a) Student Loan Debt

¶ 20. Laurin also asserts that the chancellor erred in ordering her to pay twenty percent of Greg’s student loan debt. The chancellor determined that Greg’s student loan debt is marital property after finding that “some of the student loan proceeds were expended for family needs.” Greg testified that approximately ninety percent of his student loan debt was accumulated after he and Laurin married. According to Greg, on occasion, they used some of the money for daily living expenses, such as to purchase groceries and gasoline. The chancellor made the factual finding that Greg’s student loan debt was marital property, and there is nothing in the record that refutes Greg’s testimony that a portion of his student loan proceeds were used for living expenses during their marriage. Therefore, this factual finding made by the chancellor is supported by substantial evidence. This issue lacks merit.

(b) Chevrolet Equinox

¶ 21. Laurin also contends that the chancellor erred in failing to order that the debt on the 2005 Chevrolet Equinox be paid off with the proceeds from the sale of the marital home. As noted, the chancellor held in his judgment on Laurin’s motion to reconsider: “If the debt to Regions Bank for Plaintiffs vehicle, the Chevy Equinox, is a joint marital debt it will be paid from the proceeds of the home sale; if in the name of the Plaintiff alone, she shall underwrite payment thereof.”
¶22. Laurin and Greg provided a report pursuant to Hemsley v. Hemsley, 639 So.2d 909 (Miss.1994) that was admitted into evidence. In the report, Laurin and Greg stipulated that the Chevrolet Equinox is marital property. Further, there is no dispute that the Chevrolet Equinox was purchased during the marriage. Accordingly, there is nothing for this Court to do because, as stated, the chancellor ordered the debt paid from the proceeds of the sale of the marital home “[i]f the debt to Regions Bank for Plaintiffs vehicle, the Chevy Equinox, is a joint marital debt....”

3. Alimony

¶ 23. Laurin argues that the chancellor erred in declining to award her alimony. The chancellor addressed Laurin’s request for alimony as follows:
With [Greg’s] support obligation deducted from his net income[,] he will have about $2,550.00 monthly to live on, plus the bulk of the marital debt to pay as set forth herein. Plaintiff shows a net monthly income of $1,975.00, which, with the addition of support due from [Greg], gives her $2,625.00 each month to live on, giving the Court pause to deny requests for alimony based on the criteria for awarding alimony.
The total marital debt between the parties is $156,925.64 and consists of (1) $117,000 to Wells Fargo for the mortgage on the marital home, (2) two BancorpSouth accounts which total $1,237.45, (3) two Bank of America accounts which total $23,779.19, (4) $3,978 to Chase, (5) $9,021 to Discover, and (6) $1,910 to Forrest General Hospital. The only real property that the parties own is the marital home, which the chancellor ordered to be sold. The chancellor further ordered the debt to BancorpSouth, Bank of America, Chase, and Discover to be paid from the proceeds of the sale of the marital home. The remaining debt is comprised of Greg’s student loan, valued at $104,980, and the debt to Forrest General Hospital. Finally, the chancellor ordered any remaining proceeds to be equally distributed between the parties.
*628 ¶ 24. The chancellor denied Lau-rin’s request for alimony based on his assessment of her post-divorce monthly income. We find no error with the chancellor’s decision, as we also conclude that, based on the evidence, no alimony was warranted. It is well established in Mississippi that “[ajlimony should be considered only ‘if the situation is such that an equitable division of marital property, considered with each party’s nonmarital assets, leaves a deficit for one party.’” Henderson v. Henderson, 703 So.2d 262, 265 (¶ 18) (Miss.1997) (quoting Johnson v. Johnson, 650 So.2d 1281, 1287 (Miss.1994)). Clearly, Laurin is not left with a deficit. This issue lacks merit.
¶ 25. THE JUDGMENT OF THE LAMAR COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPEL-LEE AND ONE-HALF TO THE APPELLANT.
KING, C.J., LEE, P.J., GRIFFIS, BARNES, ISHEE, ROBERTS,
CARLTON AND MAXWELL, JJ., CONCUR. MYERS, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.

. Rule 8.05 of the Uniform Chancery Court Rules requires parties in cases involving do-meslic economic issues or property division to submit a financial disclosure statement.

. There was no testimony about how the grant money was to be used. Further, Greg stated that he did not expect to receive any grant money for 2008.

. Greg testified that although he had taught summer school every year, his summer employment with the university is dependent upon whether the classes reach capacity.